Randall A. TERRY, et al., Appellants,

v.

Janet RENO, Attorney General of
the United States of America,
et al., Appellees.

No. 95–5419.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 7, 1996.

Decided Dec. 10, 1996.

1413

Mark N. Troobnick, Germantown, MD, argued the cause, for appellants. With him on the brief were Jay A. Sekulow, Virginia Beach, VA, Colby M. May and James M. Henderson, Sr., Washington, DC.

Sushma Soni, Attorney, U.S. Department of Justice, Washington, DC, argued the cause, for appellees. With her on the brief were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., U.S. Attorney, and Mark B. Stern, Attorney, Washington, DC.

Celeste Lacy Davis, Chicago, IL, and John Vanderstar, Washington, DC, were on the brief for intervenor-appellees.

Before: WILLIAMS, SENTELLE and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this case, anti-abortion protesters challenge the constitutionality of the Freedom of Access to Clinic Entrances Act. Enacted in 1994, that statute prohibits the use or threat of force or physical obstruction against a person seeking to obtain or provide reproductive health services, including abortions. Agreeing with the district court and joining four of our sister circuits, we sustain the constitutionality of the Access Act. Because the legislative record contains sufficient findings to conclude that violent and obstructive protest activities substantially affect interstate commerce in reproductive health ser-

vices, Congress did not exceed its commerce power in enacting the statute. The Access Act also does not violate the First Amendment. It prohibits conduct, not speech, and its prohibition is narrowly tailored to further the Government's legitimate interest in providing safe access to reproductive health services.

I

Reacting to a nationwide pattern of blockades, vandalism, and violence aimed at abortion clinics and their patients and employees, Congress enacted the Freedom of Access to Clinic Entrances Act. 18 U.S.C. § 248 (1994). Referred to throughout this opinion as the Access Act, the statute provides:

(a) Prohibited Activities.—Whoever—

(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with ... any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;

. . . .

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services ...

shall be subject to [criminal penalties and civil remedies], except that a parent or legal guardian of a minor shall not be subject to any penalties or civil remedies under this section for such activities insofar as they are directed exclusively at that minor.

18 U.S.C. § 248. According to the Access Act's rules of construction, nothing in it "shall be construed ... to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution...." Id. § 248(d)(1). The statute also defines the terms "interfere with," "intimidate," "physical obstruction," and "reproductive health services." Id. § 248(e)(2)-(5). "Physical obstruction," for example, means "rendering impassable ingress to or egress from a facili-

ty that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." Id. § 248(e)(4). Criminal penalties under the Access Act vary depending on whether the offense was nonviolent or violent, and whether the offender was a first-time violator or a repeat offender. Id. § 248(b).

On May 26, 1994, the day the President signed the Access Act into law, appellants filed suit in the United States District Court for the District of Columbia challenging the constitutionality of the Act both on its face and "as applied or threatened to be applied" to them. Appellants are anti-abortion activists from New York, Virginia, Ohio, and the District of Columbia, whose protest activities take place in the District of Columbia and elsewhere in the United States. Compl. at 3–5. Appellants picket abortion clinics, distribute literature, offer "sidewalk counseling" to women entering abortion facilities, and lead anti-abortion protesters in public prayer and slogan chanting. Id. at 6–9. Several appellants participated in "sit-ins," which "did have the effect, temporarily, of interfering with and blocking access to abortion facilities." Id. at 9. According to five of the six appellants, protesting against abortion "serves a higher and more compelling purpose than that served by traditional laws against trespass and blocking access to abortion facilities." Id. at 8.

The district court granted the Government's motion for judgment on the pleadings pursuant to FED.R.CIV.P. 12(c). Finding that the statute " 'protects and regulates commercial enterprises operating in interstate commerce,' " the court ruled that Congress had the power to enact the statute under the Commerce Clause. Terry v. Reno, Civ. No. 94–1154, slip op. at 11 (D.D.C. Nov. 21, 1995) (quoting Cheffer v. Reno, 55 F.3d 1517, 1520 (11th Cir.1995)). Relying on American Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 55, 133 L.Ed.2d 19 (1995), the district court held that because the Access Act was viewpoint-neutral and narrowly tailored to further substantial government interests, it did not violate the First Amendment. Terry, slip op. at 5–8.

The district court also ruled that the Act did not violate principles of due process or equal protection, that it did not violate the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb *et seq.* (1994), and that plaintiffs' Eighth Amendment claims were not ripe for review. *Terry,* slip op. at 9–13.

In their "Statement of the Issues," appellants list nine challenges to the Access Act. Appellants' Br., at vi. By failing to brief five of these challenges, they have waived them. *See* FED. R.APP. P. 28(a)(6); *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786, 790 n. 16 (D.C.Cir.1973) (where petitioners offer "no argument whatever" in support of certain issues on appeal, court will decline to consider them). Rule 28(a)(6) requires that the argument section of an appellate brief "contain the contentions of the appellant on the issues presented, and the reasons therefor ... ." FED. R.APP. P. 28(a)(6). Simply listing the issues on review without briefing them does not preserve them. *Cratty v. United States,* 163 F.2d 844, 851 (D.C.Cir. 1947) (where certain grounds for appeal are "stated by the appellants but not urged in their brief," they are treated as abandoned). We therefore address only the arguments appellants have briefed: that the Access Act exceeds Congress's commerce power; that it abridges appellants' First Amendment rights; that it violates the Equal Protection Clause; and that the district court erred in granting the Government's motion for judgment on the pleadings.

## II

Appellants' Commerce Clause challenge rests on the Supreme Court's recent decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). There, the Court struck down the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q) (1994), which made possession of a gun within a school zone a federal offense. Of the three categories of activity the Court held that Congress could regulate pursuant to its Commerce Clause authority, only the third is relevant to this case: Congress can regulate activities if it has a rational basis for concluding that they "substantially affect interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630. The *Lopez* Court found that possession of guns within school zones was not commercial in nature, that the statute did not contain a jurisdictional element to ensure on a case-by-case basis that the gun in question was connected with interstate commerce, and that Congress had made no findings about the effect gun possession in school zones has on interstate commerce. *Id.* at ——–——, 115 S.Ct. at 1630–32. The Court then considered and rejected the Government's arguments, developed only after the statute's constitutionality was challenged in court, linking the possession of guns near schools to interstate commerce. *Id.* at ——–——, 115 S.Ct. at 1632–33. Because it could not conclude that Congress had a rational basis for finding that gun possession within school zones had a substantial effect on interstate commerce, the Court declared the statute unconstitutional. *Id.* at ——, 115 S.Ct. at 1634.

*Lopez*'s impact on the limits of the commerce power is a hotly debated issue. Because the Access Act does not test those limits, we need not enter that fray. Indeed, we can begin where the *Lopez* Court could not—with congressional findings regarding the effect on interstate commerce of anti-abortion violence and blockades of abortion clinics.

Although no interstate commerce findings appear in the text of the statute, we consider "even congressional committee findings" regarding the effect on interstate commerce of the regulated activity. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631; *see, e.g., Preseault v. ICC,* 494 U.S. 1, 17, 110 S.Ct. 914, 924–25, 108 L.Ed.2d 1 (1990) (citing House Report in discussion of congressional findings regarding effect on interstate commerce of federal "rails-to-trails" statute). The Senate Committee on Labor and Human Resources, which held hearings on anti-abortion violence and drafted the bill that ultimately became the Access Act, concluded that for several reasons abortion clinics do engage in interstate commerce: they obtain medical equipment and supplies through interstate commerce, they treat patients who travel interstate to obtain services, their employees

travel interstate, and they own and lease office space and generate income. S.REP. No. 103–117, at 31 (1993).

Having concluded that abortion clinics engage in interstate commerce, the Committee also documented the effect violent and disruptive anti-abortion protest activities have on clinics and their operations. According to the Senate Report:

> A nationwide campaign of anti-abortion blockades, invasions, vandalism and outright violence is barring access to facilities that provide abortion services and endangering the lives and well-being of the health care providers who work there and the patients who seek their services. This conduct is interfering with the exercise of the constitutional right of a woman to choose to terminate her pregnancy, and threatens to exacerbate an already severe shortage of qualified providers available to perform safe and legal abortions in this country.

*Id.* at 3. The Report chronicled escalating violence against abortion providers and clinics, including eighty-four assaults, thirty-six bombings, eighty-one arsons, seventy-one chemical attacks, 131 death threats, two kidnappings, 327 clinic invasions, over 6,000 blockades, and—as of 1993—one murder. *Id.* at 3–11. According to the Committee, protester violence and blockades forced temporary or permanent closure of abortion facilities, causing doctors to refuse to perform abortions and producing a scarcity of both clinics and physicians. *Id.* at 14–17. The number of doctors providing abortion services declined in thirty-four states between 1985 and 1988. *Id.* at 17 n. 29. Some doctors traveled to several states, some for hundreds of miles, to perform abortions at clinics which had no physicians of their own. *Id.* at 31 & n. 46. Patients, too, sometimes traveled hundreds of miles to obtain abortions, either within their states or at clinics in other states. *Id.* at 31. The Committee also found that in some rural areas, arson and chemical attacks had forced medical clinics to stop providing not only abortions, but other reproductive services as well, including pre- and post-natal care. *Id.* at 5–6.

According to the Committee, some anti-abortion organizations engaged in concentrated nationwide campaigns against abortion clinics and physicians providing abortions. *Id.* at 11–14. Relying on statements of those groups' leaders, the Committee concluded that clinic blockades, threats against employees, and other violent and obstructive activities have a single goal: to eliminate the practice of abortion by closing abortion clinics. *Id.* at 11.

Although this legislative record amply supports Congress's finding that the activities of anti-abortion activists affect interstate commerce, this conclusion does not end our analysis; *Lopez* holds that the effect on interstate commerce must be "substantial." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630. As the Court acknowledged, the standard was not always so demanding: "[O]ur case law has not been clear whether an activity must 'affect' or 'substantially affect' interstate commerce in order to be within Congress' power to regulate it. . . ." *Id.* In one case, the Court described the standard this way:

> The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding.

*Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) (citing *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964), and *Katzenbach v. McClung,* 379 U.S. 294, 303–04, 85 S.Ct. 377, 383–84, 13 L.Ed.2d 290 (1964)); *see also Preseault,* 494 U.S. at 17, 110 S.Ct. at 924 ("[W]e must defer to a congressional finding that a regulated activity affects interstate commerce 'if there is any rational basis for such a finding.'" (quoting *Hodel*)).

■ We think it obvious that Congress's failure to use the magic word "substantial" is not fatal to the statute's constitutionality. For one thing, since Congress passed the Access Act prior to *Lopez,* it understandably

did not find that activities proscribed by the statute "substantially" affect interstate commerce; it simply found that those activities "affect" interstate commerce. S.REP. No. 103–117, at 31. Moreover, if Congress "normally is not required to make formal findings" as to the burdens that particular activities place on interstate commerce, *Lopez,* — U.S. at ——, 115 S.Ct. at 1631, then Congress surely need not make formal findings that the activities "substantially" affect interstate commerce. Just as we can examine the legislative history to assure ourselves that Congress made findings regarding the impact of anti-abortion activities on interstate commerce, *supra* at 1415–16, we can, as appellants' counsel conceded at oral argument, examine those findings to assure ourselves that the impact is substantial. In light of the Senate Report's detailed review of the effect violent and obstructive anti-abortion protest has had upon the availability of abortions nationwide, we have no doubt that Congress found the impact of such activities on interstate commerce to be substantial.

Appellants argue that the Access Act regulates not abortion clinics, but *protest* against abortion clinics, and that Congress may not regulate protest under the Commerce Clause. Although two circuits have found that the Act does in fact regulate the provision of reproductive health services, *United States v. Wilson,* 73 F.3d 675, 683 (7th Cir. 1995) (Act regulates provision of health services "by preventing its obstruction"), *cert. denied,* — U.S. ——, 117 S.Ct. 47, 136 L.Ed.2d 12 (1996); *Cheffer v. Reno,* 55 F.3d at 1520 (unlike statute challenged in *Lopez,* Access Act "does regulate commercial activity, the provision of reproductive health services"), we need not address that issue. As counsel conceded at oral argument, Congress has authority to regulate "*activities* that substantially affect interstate commerce." *Lopez,* — U.S. at ——, 115 S.Ct. at 1630 (emphasis added). The regulated activity—in this case, interfering with abortion clinics—need not be commercial, so long as its effect on interstate commerce is substantial. As the Supreme Court said in a different context, "An enterprise surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seek-

ing motives." *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 258, 114 S.Ct. 798, 804, 127 L.Ed.2d 99 (1994). Like the Eleventh Circuit, we find no support for "the proposition that Congress' Commerce Clause authority extends only to the regulation of commercial actors, and not private individuals who interfere with commercial activities in interstate commerce." *Cheffer,* 55 F.3d at 1520 n. 6; *see also United States v. Dinwiddie,* 76 F.3d 913, 920 (8th Cir.) (same), *cert. denied,* — U.S. ——, 117 S.Ct. 613, 136 L.Ed.2d 538 (1996); *Wilson,* 73 F.3d at 684–85 (same).

We can quickly dispose of appellants' remaining Commerce Clause challenges. Although they may be correct that, by itself, interstate travel by patients and staff is insufficient to justify finding that clinic operations affect interstate commerce, their reliance on *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), is misplaced. *Bray's* holding that anti-abortion protest does not implicate the constitutional right to interstate travel, *id.* at 274–77, 113 S.Ct. at 762–63, is irrelevant to the inquiry in this case, i.e., whether patients in fact travel interstate to obtain abortions. In fact, the *Bray* Court's implicit acceptance of the district court's findings that substantial numbers of women traveled interstate to have abortions reinforces the congressional findings underlying the Access Act. *Id.* at 274–75, 113 S.Ct. at 762. In any event, travel by patients and staff was not the Committee's only finding regarding whether abortion clinics operate in interstate commerce. The Committee also found that clinics purchase equipment and supplies in interstate commerce, own and lease office space, and generate income. S.REP. No. 103–117, at 31. Combined with such findings, the interstate travel of patients and staff supports the conclusion that the Access Act does not exceed Congress's Commerce Clause power.

Appellants' argument that the "decrease in the number of abortions" is insufficient to justify the statute ignores the critical fact: the marked decrease in the *availability* of abortions nationwide, a decrease Congress attributed both to the forced closure of clin-

ics by blockades or violence, and to the decreasing number of physicians willing to perform abortions because of protesters' threats. "It is this *threat to a national market*," the Seventh Circuit observed, "which Congress found to be scarce and declining in availability, that distinguishes Congress's authority to regulate in this case from its probable lack of authority to regulate, for example, shoplifting. . . ." *Wilson*, 73 F.3d at 682 (emphasis added).

■ Aside from their unsuccessful challenges to the congressional findings, appellants' only other Commerce Clause argument is that the Access Act is invalid because it lacks a jurisdictional element. We do not view *Lopez* as holding that federal criminal statutes must contain jurisdictional elements. If a jurisdictional element were critical to a statute's constitutionality, the Court in *Lopez* would not have gone on to examine the Government's proffered rationales for the constitutionality of the gun possession statute. *See Lopez*, —— U.S. ——–——, 115 S.Ct. at 1632–34. *Lopez*'s fundamental proposition is that Congress must ensure that its Commerce Clause power to regulate noncommercial activities extends to only those activities that substantially affect interstate commerce. Congress may do so either through its own legislative findings or by including a jurisdictional element in the statute; it need not do both. Where, as here, detailed congressional findings support the conclusion that the activities prohibited by the Access Act substantially affect interstate commerce, the absence of a jurisdictional element is not fatal to the statute's constitutionality. *See Wilson*, 73 F.3d at 685 ("In discussing the lack of a jurisdictional element in *Lopez*, the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional.").

■ In concluding that the Access Act satisfies *Lopez*, we think it significant that the statute fundamentally differs from the statute struck down in *Lopez*. The Access Act prohibits activities—force, threats, physical obstruction of access to or from reproductive health facilities, and physical damage to those facilities. The statute invalidated in *Lopez* did not prohibit active interference of this sort, but rather simple possession of a gun near a school. This difference is telling. As the Court explained in *Lopez*, in order to justify the constitutionality of prohibiting gun possession near schools, the Government had to engage in several multi-step analyses to link gun possession to interstate commerce: (1) gun possession near schools leads to gun use, which in turn leads to violent crime, which in turn imposes substantial costs on society, which in the end affects interstate commerce; and (2) gun possession near schools threatens the educational environment, which hampers the educational process, which creates a "less productive citizenry," which adversely affects "the Nation's economic well-being," and which in the end adversely affects interstate commerce. *Lopez*, —— U.S. at ——, 115 S.Ct. at 1632. In the case before us, the chain connecting the prohibited activity and interstate commerce contains only one link: violent and obstructive activity outside abortion clinics adversely affects interstate commerce in reproductive health services. In enacting the Access Act, Congress did not exceed its Commerce Clause power.

### III

We turn to appellants' First Amendment challenges to the Act. Applying long-standing Supreme Court precedents, we find the statute compatible with the First Amendment.

■ To begin with, the Access Act does not target protected speech. It prohibits three types of conduct: use of force, threat of force, and physical obstruction. In this sense, the Access Act is virtually identical to the statute upheld in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which also punished conduct—the destruction of draft cards. Moreover, the Supreme Court has ruled that the Government can punish all three types of conduct covered by the Access Act without

running afoul of the First Amendment. The first, physical assault, "is not by any stretch of the imagination expressive conduct protected by the First Amendment." *Wisconsin v. Mitchell,* 508 U.S. 476, 484, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993). Threats are not protected speech either. *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, ——, 114 S.Ct. 2516, 2529, 129 L.Ed.2d 593 (1994) ("Threats to [clinic] patients or their families, however communicated, are proscribable under the First Amendment."). Consistent with the First Amendment, the Government may also punish physical obstruction that makes passage to or from a reproductive health facility impossible or unreasonably hazardous. *Cameron v. Johnson,* 390 U.S. 611, 617, 88 S.Ct. 1335, 1338–39, 20 L.Ed.2d 182 (1968). Protesters have no First Amendment right to "cordon off a street, or [the] entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965). Going "beyond protest," such activity "invade[s] property rights." *United States v. Soderna,* 82 F.3d 1370, 1375 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 507, 136 L.Ed.2d 398 (1996). *O'Brien, Mitchell, Madsen,* and *Cox* thus squarely govern this case.

■■■■ That conduct prohibited by the Access Act might have expressive value, such as in the case of sit-ins which "temporarily ... interfer[e] with and block[ ] access to abortion facilities," *see* Compl. at 9, does not alter our conclusion regarding the Act's constitutionality. Congress may regulate conduct with expressive content without running afoul of the First Amendment if the legislation "furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. The Access Act meets this standard.

The statute furthers several important government interests, not the least of which are ensuring access to lawful health services and protecting the constitutional right of women seeking abortions and other pregnancy-related treatment. As in *O'Brien,* the Government's interest is unrelated to the suppression of free expression. The statute at issue in *O'Brien* prohibited destroying draft cards, not destroying draft cards by anti-war protesters. Here the statute prohibits interfering with reproductive health services, not interfering with those services by anti-abortion demonstrators. The statute therefore "condemns only the independent noncommunicative impact of conduct within its reach." *Id.* at 382, 88 S.Ct. at 1682. Moreover, the Act protects individuals providing and obtaining "reproductive health services," not just abortions. The statute defines "reproductive health services" to include "medical, surgical, counselling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy." 18 U.S.C. § 248(e)(5). The Access Act thus does not play favorites: it protects from violent or obstructive activity not only abortion clinics, but facilities providing pre-pregnancy and pregnancy counseling services, as well as facilities counseling alternatives to abortion. *See Riely v. Reno,* 860 F.Supp. 693, 702 (D.Ariz.1994) (Access Act "would apply to an individual who spray paints the words 'KEEP ABORTION LEGAL' on a facility providing counseling regarding abortion alternatives as well as to the individual who spray paints the words 'DEATH CAMP' on a facility providing abortion services."). Because the Act criminalizes only violent or obstructive conduct against reproductive health facilities or those seeking to obtain or provide reproductive health services, the views of those arrested for committing violence against or obstructing people obtaining or providing reproductive health services are irrelevant.

That the majority of those whose conduct the statute punishes probably oppose abortion does not call the statute's neutrality into question. In *O'Brien,* the Court upheld a law prohibiting willful destruction of draft cards even though most people destroying their draft cards opposed the Vietnam War. There is, after all, "no disparate-impact theo-

ry in First Amendment law." *Dinwiddie*, 76 F.3d at 923. Appellants "cannot obtain constitutional immunity from prosecution by violating a statute more frequently than any other group." *Soderna*, 82 F.3d at 1376 (citing *Madsen*, 512 U.S. at –– –– ––, 114 S.Ct. at 2523–24).

The Access Act survives *O'Brien*'s third inquiry: the statute is narrowly tailored to further the Government's interests. As the Eighth Circuit put it in *Dinwiddie*, the statute merely "forbids physical interference with people going about their own lawful private business." *Dinwiddie*, 76 F.3d at 924. The Act also leaves open ample alternative means for communication: "In a non-violent, non-obstructive manner, protestors may still stand outside reproductive health facilities and express their anti-abortion message. They may still proclaim their views and make their pleas by voice, signs, handbills, symbolic gestures and other expressive means." *American Life League*, 47 F.3d at 652 (footnote omitted).

Our conclusion that the Access Act satisfies the *O'Brien* test might be different if, notwithstanding the Act's clear focus on conduct, the Government were using it to prosecute appellants for their First Amendment activity. But this is not such a case. Appellants' complaint does not allege that defendants applied the Act to them or their protest activities, nor have they amended the complaint to include such allegations. Indeed, they filed their complaint on the day the Access Act was signed into law.

▮▮▮ The statute's motive requirement—that a person violates the Act by engaging in proscribed conduct "because" a person is obtaining or providing reproductive health services—is not, as appellants claim, fatal to its constitutionality. Again, *Wisconsin v. Mitchell* controls. The statute at issue in that case enhanced the sentence for aggravated battery if the aggressor " 'intentionally select[ed]' " his victim on the basis of his " 'race, religion, color, disability, sexual orientation, national origin or ancestry . . . . ' " *Mitchell*, 508 U.S. at 480, 113 S.Ct. at 2197 (quoting Wis. Stat. § 939.645(1)(b) (1989–1990)). The Wisconsin Supreme Court had invalidated the statute because, in its view,

the law criminalized bigoted thought—it " 'punishe[d] the "because of" aspect of the defendant's selection, the *reason* the defendant selected the victim, the *motive* behind the selection.' " *Id.* at 482, 113 S.Ct. at 2197 (quoting *Wisconsin v. Mitchell*, 169 Wis.2d 153, 485 N.W.2d 807, 812 (1992)). Reversing, the Supreme Court found that motive "plays the same role under the Wisconsin statute as it does under federal and state antidiscrimination laws," which the Court has consistently upheld against constitutional challenge. *Mitchell*, 508 U.S. at 487, 113 S.Ct. at 2200 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984) (no First Amendment right to discriminate in membership of charitable organization on basis of sex in violation of state antidiscrimination law); *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984) (no First Amendment right to discriminate in hiring on basis of sex in violation of Title VII); *Runyon v. McCrary*, 427 U.S. 160, 176, 96 S.Ct. 2586, 2597, 49 L.Ed.2d 415 (1976) (no First Amendment right to discriminate on basis of race in selecting who may attend a private school). The *Mitchell* Court distinguished the ordinance invalidated in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), from the Wisconsin statute it upheld, pointing out that the former explicitly targeted expression—" 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion, or gender' "—while the Wisconsin statute targeted conduct unprotected by the First Amendment. *Mitchell*, 508 U.S. at 487, 113 S.Ct. at 2200–01.

Nothing distinguishes the case before us today from *Mitchell*. Like the statute in *Mitchell*, the Access Act targets not expression, but conduct. As the Court recognized in *R.A.V.*, "Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V.*, 505 U.S. at 390, 112 S.Ct. at 2546. The Act's motive requirement, as with similar requirements in other federal statutes, *see, e.g.*, 42 U.S.C. § 3631 (1994) (Fair Housing Act provision prohibiting use or threat of force against person because he or she participates in cer-

tain housing programs); 42 U.S.C. § 1971(b) (1994) (Voting Rights Act provision stating that no person shall threaten another for the purpose of interfering with his or her right to vote), does not make the Access Act an instrument for the suppression of speech. It merely narrows the Act's reach.

 Remaining are appellants' claims that the Access Act is overbroad and vague. A statute is overbroad only if "it reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982); *see City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) ("Only a statute that is substantially overbroad may be invalidated on its face."). Contrary to appellants' argument, the Access Act prohibits only a narrow range of conduct: the use or threat of force, or nonviolent physical obstruction, intended to prevent access to or the provision of reproductive health services. Moreover, the statute contains language barring its application to expressive conduct protected by the First Amendment, such as picketing or other peaceful demonstration. 18 U.S.C. § 248(d)(1). Appellants suggest two allegedly impermissible applications of the statute:

> [The Access Act] criminalizes "threats" that the person who is uttering the "threat" will harm *himself* if another person obtains or provides an abortion. Sec. 248(e)(3) (definition of "intimidate"). [The Access Act] therefore criminalizes a genuine threat to go on an extended "hunger strike"—i.e., risk "bodily harm" to oneself—if another person obtains or provides an abortion. Under section 248(a)(1) and (e)(3), such a "threat" would constitute criminal intimidation because it would "place a person in reasonable apprehension of bodily harm ... *to another*." [The Access Act's] definition of "intimidation" would also include the "harm" of increased medical risk—a harm abortion advocates claim is inherent in *any* delay or denial of abortion (even by voluntary choice of childbirth).

Appellants' Br., at 37. When "judged in relation to the statute's plainly legitimate sweep," neither of these examples renders the statute overbroad. *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973).

 We are equally unpersuaded by appellants' vagueness challenge. A statute is unconstitutionally vague if it does not give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). In arguing that the terms "interfere with" and "intimidate" are vague, appellants ignore the statute's explicit definition of these terms. "Interfere with" means "to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2). "Intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." *Id.* § 248(e)(3). Because the Supreme Court has held that the term " 'unreasonably interfere' plainly require[s] no 'guess[ing] at [its] meaning,' " *Cameron*, 390 U.S. at 616, 88 S.Ct. at 1338, we fail to see how the term "interfere with," confined as it is by the narrow definition in the statute, could possibly be vague. We agree with the Fifth Circuit, moreover, that the term "intimidate" is "obviously widely used and commonly understood in statutory contexts." *CISPES v. FBI*, 770 F.2d 468, 477 (5th Cir.1985); *see also United States v. Gilbert*, 813 F.2d 1523, 1530 (9th Cir.) (rejecting vagueness challenge to Fair Housing Act, 42 U.S.C. § 3631, which prohibits the use or threat of force to "injure, intimidate, or interfere with" a person because he or she is participating in certain housing programs), *cert. denied*, 484 U.S. 860, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987); *Dinwiddie*, 76 F.3d at 924 (definition of "intimidate" in Access Act similar to that of an element in crime of assault). While "the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question,' " *Grayned*, 408 U.S. at 110 n. 15, 92 S.Ct. at 2300 n. 15 (quoting *American Communications Ass'n v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950)), the Access Act defines its terms narrowly and in clearly understandable language.

 Protest, picketing, and other like activities lie at the core of free speech guaran-

teed by the First Amendment. For decades, courts have protected such forms of protest, regardless of the popularity of the protesters or their cause. Because this case is only about whether Congress can protect clinics engaged in the lawful provision of reproductive health services from physical disruption, our decision does not signal a weakening of those First Amendment protections.

## IV

██ Buried in one sentence of appellants' brief is their argument that the Access Act violates the Fifth Amendment's equal protection guarantee. According to appellants, since the statute allows labor but not anti-abortion picketing, it limits a particular form of social protest. Because anti-abortion activists are not a suspect class, and because the Access Act infringes upon no constitutionally protected rights, *see* Part III *supra,* we ask only whether Congress had a rational basis for prohibiting violent or obstructive acts committed with intent to interfere with the provision of lawful medical services. For the same reasons that the Access Act survives appellants' First Amendment challenges, it clearly passes this more deferential test.

## V

We turn finally to appellants' argument that the district court should not have granted the Government's Rule 12(c) motion because outstanding questions of fact precluded judgment on the pleadings. Specifically, they claim that the district court disregarded evidence that the Government has interpreted the Access Act to "proscribe[ ]" protesting, picketing, leafletting, singing, chanting, and the like, and that the Attorney General has attempted to enjoin anti-abortion protesters from engaging in those activities near abortion clinics. This argument ignores the Government's answers to appellants' requests for admission, where the Government stated, under oath, that none of appellants' First Amendment activities violates the Access Act.

Appellants' argument also comes perilously close to misstating the record. In one of the cases they rely on to support their claim that the Government is using the Access Act to punish First Amendment activity, the Government filed suit against several anti-abortion protesters who had stalked and threatened clinic employees and who had welded themselves inside cars blocking access to an abortion clinic. *United States v. Lindgren,* No. A3–95–4 (D.N.D. complaint filed Jan. 18, 1995). That complaint targeted neither speech nor picketing. Moreover, the remedy the Government sought—a 200–foot buffer zone around the clinic and its employees—was intended to protect protesters' First Amendment rights while also protecting the constitutional right to an abortion. *Id.* at 9–10. In each of the other three cases appellants rely on, the Government prosecuted not speech, but only violent or disruptive conduct: blocking access to a clinic by welding protesters inside cars parked against clinic doors, *Milwaukee Women's Med. Serv's., Inc. v. Brock,* Civ. No. 94–C–0793 (E.D. Wis. complaint in intervention filed Dec. 20, 1994) at 3; and threatening, stalking, and assaulting clinic employees, *United States v. Smith,* No. 74:95CV–0025 (N.D. Ohio complaint filed Jan. 4, 1995) at 3–6, *United States v. Dinwiddie,* No. 95–1101–CV–W–8 (W.D. Mo. complaint filed Jan. 1995) at 2. In each case, the requested relief included buffer zones tailored to specific violations of the Access Act. *See Smith,* Compl. at 7–8 (requesting injunctive relief including 50–foot buffer zone around clinic and 25–foot buffer zone around doctor's home); *Brock,* Compl. at 5 (seeking injunctive relief including 50–foot buffer zone around clinic); *Dinwiddie* (W.D. Mo. temporary restraining order filed Jan. 6, 1995) at 7 (temporarily restraining defendant from locating within 500 feet of any reproductive health facility within court's jurisdiction). *See generally Madsen,* 512 U.S. at ——— ——, 114 S.Ct. at 2527–28 (upholding reasonably circumscribed buffer zones as remedy for violations of the law by anti-abortion protesters). The cases relied on by appellants thus fall far short of showing that the Government uses the Access Act to "proscribe" protected speech. Those cases involve a wholly separate question: whether courts sitting in equity may enjoin activities that do not violate the Act as a remedy for activities

that quite clearly do violate the Act. That question has no bearing here.

Appellants argue that the District Court also ignored evidence that the Government was not applying the Act evenhandedly. Although they claim that the Government has refused to prosecute abortion clinic escorts and employees who assault and threaten anti-abortion protesters, appellants make no selective enforcement allegation in their complaint, nor have they amended their complaint to state such a claim. In ruling on the Government's Rule 12(c) motion, the district court properly refused to consider evidence outside the scope of the complaint. *See Haynesworth v. Miller*, 820 F.2d 1245, 1249 n. 11 (D.C.Cir.1987) (Rule 12(c) requires movant to show, at close of pleadings, that no genuine issue of material fact remains to be resolved).

We affirm the judgment of the district court.

*So ordered.*