WEIS, Circuit Judge,
Dissenting.
Were I to reach the damages issue in this case, I would agree with the majority’s conclusion that defendants are liable on a joint and several basis per incident, and not per individual. Obviously, if the government had sought actual damages, it would have been restricted to recovering an amount proven at trial, and that sum could be recovered only ■ once. The fact that Congress provided for statutory damages as an alternative to establishing the actual loss does not change the nature of the compensation, nor make it cumulative.
However, I differ with the majority in its conclusion that FACE survives constitutional scrutiny. I am aware that seven Courts of Appeals have upheld the constitutionality of the Act. Some of these decisions were made over dissents arguing that FACE could not be sustained under the analysis in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Although the Courts of Appeals opinions considered Lopez, they essentially treated it as a narrow holding that did not affect measures such as FACE.
Doubts that Lopez had application beyond its unique factual setting, however, were dissipated by the expansive holding in United States v. Morrison, — U.S. -, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). There, the Court revisited the question of Congress’ power under the Commerce Clause to legislate on matters traditionally within the prownce of the States. Setting aside portions of the Violence Against Women Act, the Court wrote that “[w]e accordingly reject the argument that Congress may regulate non-economic, violent criminal conduct based solely on that conduct’s aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local.” Id. at -, 120 S.Ct. at 1754. Continuing, the Court said, “we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.” Id.
Together, Lopez and Morrison mandate limits to the federalization of local crime under the aegis of the Commerce Clause. FACE, like the Gun-Free School Zones Act and the Violence Against Women Act, *269 is an example of congressional intrusion into criminal law traditionally within the province of the States. These statutes are similar in that “neither the actors nor their conduct has a commercial character, and neither the purposes nor the design of the statute[s] has an evident commercial nexus.” Lopez, 514 U.S. at 580, 115 S.Ct. 1624 (Kennedy, J., concurring).
Considered alone, these statements clearly raise the likelihood that FACE is unconstitutional. Upon more detailed review, it becomes clear that Morrison permits no other conclusion.
As the majority here observes, the Supreme Court has identified three categories of activities that Congress may regulate under the Commerce power: first, the use of channels of interstate commerce; second, the instrumentalities of interstate commerce or persons or things in interstate commerce, even though the threat may come only from intrastate activity; and third, activities that substantially affect interstate commerce. Morrison, — U.S. at-, 120 S.Ct. at 1749. No contention has been made that the first category is involved here, and the Courts of Appeals that have considered the constitutionality of FACE have generally upheld the Act under the third category. For this reason, I will begin with a discussion of that point.
I. Regulation of Activities
Having a Substantial Relation To Interstate Commerce
In determining whether Congress may properly regulate an activity under the third Commerce Clause classification, Lopez and Morrison present considerations that can be distilled into the following four questions:
1) Is the activity of an apparent commercial character;
2) Does the statute contain an express jurisdictional element that may establish a connection with interstate commerce;
3) Are there congressional findings that illuminate a reasonable legislative judgment that the activity substantially affects interstate commerce, although such an effect is not “visible to the naked eye”; and
4) Is there a link between the activity and a substantial effect on interstate commerce that is not so attenuated that the federal-state balance is destroyed?
See Morrison, — U.S. at-& n. 4, 120 S.Ct. at 1749-52 & n. 4; Lopez, 514 U.S. at 559-68, 115 S.Ct. 1624. These considerations will be examined in turn.
A. The Activity is Not Commercial
FACE is drafted to prohibit specific conduct outside reproductive health climes. It provides in relevant part:
(a) Prohibited activities. — -Whoever—
(1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;
(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services ...
shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c)....
18 U.S.C. § 248.
The services provided by abortion clinics are clearly commercial in nature, conducted as they are in exchange for money. But these services are not the activities targeted by the legislation. FACE prohibits third parties from interfering with patients and staff entering abortion clinics, as well as from inflicting damage to the property itself. By its plain language, the *270 statute is directed against the conduct of those external to a clinic’s operations.
As the proscribed activity, a protestor’s conduct- does not involve a purchase, sale, or any exchange of value in return for the rendering of a service, and cannot in any sense be deemed economic or commercial in character. Although blockades may reduce a clinic’s revenue, the prohibited conduct is fundamentally criminal in nature and does not fit easily within the category of commercial activity.
The fact that criminal conduct may also have financial effects does not transform that activity into one commercial in nature. Murder and robbery have monetary consequences, but that does not transform criminal codes into commercial regulation. Morrison made it clear that the nature of the activity to be restricted is determined by an examination of the conduct itself, and not by such external factors as financial effects, which are one step removed from the' statute’s focus. Morrison, — U.S. at-, 120 S.Ct. at 1750.
In both Lopez and Morrison, the financial effects of the prohibited conduct were not disputed. Justice Breyer outlined in his Lopez dissent the “obvious” links between the economy and gun violence. Lopez, 514 U.S. at 619-22 (Breyer, J., dissenting). Justice Souter’s dissent in Morris on cited a Senate report from the legislative history that estimated the impact of violent crimes against women to be, at minimum, $3 billion annually. Morrison, — U.S. at-, 120 S.Ct. at 1762 (Souter, J., dissenting). The Court nonetheless concluded in Lopez that the Gun Free School Zones Act was “a criminal statute that by its terms has nothing to do with ‘commerce’ or any sort of economic enterprise,” Lopez, 514 U.S. at 561, 115 S.Ct. 1624, and said , in Morrison that “[g]en-der-motivated crimes of violence are not, in any sense of the phrase, economic activity.” Morrison, - U.S. at-, 120 S.Ct. at 1751.
It is apparent that the Court examined the prohibited conduct without reference to its economic effects. Courts reviewing FACE should employ a similarly disciplined analysis.
When considering the limits of congressional power, the Court has adopted a “practical conception of commercial regulation.” Lopez, 514 U.S. at 574, 115 S.Ct. 1624 (Kennedy, J.,' concurring); see also Morrison, — U.S. at-, 120 S.Ct. at 1750 (quoting Lopez). But to sustain FACE, courts must reject that concept. The statute does not resemble a commercial regulation, but instead a typical exercise of a state’s police power: prohibiting trespass, intimidation, and violence; and providing criminal sanctions as well as injunctions.
The threshold inquiry articulated in Lopez and repeated in Morrison is consistent with the Court’s prior Commerce Clause decisions. As the Court wrote, “thus far in our Nation’s history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.” Morrison, — U.S. at —■—, 120 S.Ct. at 1751. Two cases cited by the Court in that context provide a useful contrast to the present dispute.
In Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 261-62, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and the parallel case of Katzenbach v. McClung, 379 U.S. 294, 305, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), the Court upheld legislation requiring hotels and restaurants to make accommodations open to black patrons as well as white. The regulated enterprises were clearly within Morrison’s definition of economic activity. It was the hoteliers and restauranteurs themselves, in the operation of their business, who had to alter their conduct in order to comply with the law. The legislation did not apply to third parties whose conduct may or may not have been commercial.
FACE does not in any way control the operation of a clinic in its procedures or selection of patients. That distinction, as well as the lack of a jurisdictional element, *271 separates FACE from the Civil Rights legislation upheld in Heart of Atlanta and Katzenbach.
To cavalierly dismiss the traditional distinctions between criminal and commercial conduct is to “downplay the role that the economic nature of the regulated activity plays in our Commerce Clause analysis.” Morrison, — U.S. at-, 120 S.Ct. at 1750. Both Lopez and Morrison made the inquiry into commercial character a key element to their holdings. In the present case, the only reasoned answer to the question of whether the blockading is commercial in character must be in the negative.
B. The Act Contains No Jurisdictional “Hook”
A jurisdictional element in a statute serves to define the limits of the regulated activity. Including such a requirement assures that the legislation is directed toward a defined scope of conduct, one more apt to be within the reach of the commerce power granted to Congress. See United States v. Bishop, 66 F.3d 569, 594 (3d Cir.1995) (Becker, Ch. J., concurring in part and dissenting in part). A statutorily required proof of connection with interstate commerce mandates a case-by-case inquiry.
Stressing the redemptive power of such an element, the Court in Lopez discussed United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), where it circumspectly read federal gun legislation to require a nexus with interstate commerce. Lopez, 514 U.S. at 562, 115 S.Ct. 1624. In Bass, the Court chose to avoid a potential constitutional infirmity in this fashion because “ ‘unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.’ ” Id. (quoting Bass, 404 U.S. at 349, 92 S.Ct. 515). Similarly, Jones v. United States, — U.S. -, -, --, 120 S.Ct. 1904, 1908, 1910, 146 L.Ed.2d 902 (2000), carefully interpreted an arson statute so as not to apply to all private residences and thus avoided the constitutional issues, despite interstate connections in the forms of a mortgage, an insurance policy and the use of natural gas.
But in FACE, there is no such ambiguity. Indeed, it appears that Congress simply sought to extend a “remedy over a wider, and more purely intrastate, body of violent crime.” Morrison, — U.S. at -, 120 S.Ct. at 1752. Without a jurisdictional clause to provide a case-by-case limitation, the Act’s reach becomes vulnerable to a Constitutional challenge.
Because FACE lacks the jurisdictional element, the government in this case was not required to establish any connection with interstate commerce. It was not necessary to show that interstate travel was hindered or affected, that equipment or furnishings were purchased in interstate commerce, or that any of the other jurisdictional indicia that have been used in statutes that have passed constitutional muster were satisfied. All that the government had to show was that a clinic, even if a purely local enterprise, was being blockaded. The prosecutor thus had almost unlimited discretion to intervene in a purely local disturbance.
The preservation of the constitutional allocation of power between state and federal governments is a serious concern for both the legislative and judicial branches. Including a jurisdictional requirement in a statute is one way Congress can demonstrate that it recognizes this important issue and has acted in light of that knowledge.
The absence of a jurisdictional clause in FACE is a fatal flaw, one that is not cured by the congressional findings that will be discussed next.
C. The Legislative Findings Are Inadequate
Unlike Lopez, but like Morrison, FACE’S legislative history contains congressional findings. As a result of hear *272 ings, Congress alleged in Committee reports and in floor debates that patients and doctors travel interstate for abortions; that local authorities were sometimes unable to control violence at abortion clinics; and that obstructionist tactics had caused losses in the millions of dollars, caused clinics to close, and had intimidated physicians as well as patients. Based on anecdotal evidence, Congress decided that federal intervention authorized by the Commerce Clause and section 5 of the Fourteenth Amendment was appropriate.
On several occasions, we have said that congressional findings are entitled to judicial deference and that it is not our role to “ ‘second-guess the legislative judgment of Congress.’ ” United States v. Parker, 108 F.3d 28, 30 (3d Cir.1997) (quoting Bishop, 66 F.3d at 577). Accordingly, all that was required of a reviewing court was to ensure that Congress had a rational basis for its legislation. Id.
However correct that approach may be in other settings, it can no longer be said that such substantial deference is due in cases assessing the limits of congressional power under the Commerce Clause. In Morrison, the Court stated that “the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation.” Morrison, — U.S. at-, 120 S.Ct. at 1752. Whether the effect upon interstate commerce is substantial enough to make Congress’ exercise of power under the Commerce Clause appropriate “is ultimately a judicial rather than a legislative question.” Id.
As the basis for concluding that blockades have a substantial effect upon interstate commerce, Congress reasoned that obstructions that deter patients from going to a clinic caused diminished business for the enterprise. In some cases, when clinics closed, women were required to travel, perhaps interstate, to obtain the services of another establishment.
This is the very same “but-for causal chain” of logic that the Court explicitly rejected in Morrison. Id. at-, 120 S.Ct. at 1752-53. If every attenuated effect upon interstate commerce stemming from an occurrence of violent crime satisfied the substantial effects test, then Congress could “regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption.” Id.
The opinions of the Courts of Appeals that have upheld FACE all rely heavily on the legislative history for concluding that a substantial effect on interstate commerce existed. See United States v. Weslin, 156 F.3d 292, 296 (2d Cir.1998); United States v. Bird, 124 F.3d 667, 678 (5th Cir.1997); Terry v. Reno, 101 F.3d 1412, 1415-16 (D.C.Cir.1996); United States v. Dinwiddie, 76 F.3d 913, 920-21 (8th Cir.1996); United States v. Wilson, 73 F.3d 675, 681 (7th Cir.1995); Cheffer v. Reno, 55 F.3d 1517, 1520-21 (11th Cir.1995); American Life League v. Reno, 47 F.3d 642, 647 (4th Cir.1995). But these decisions are undercut by Morrison. With the asserted justifications constitutionally infirm, the legislative history does little to demonstrate a reasonable congressional judgment that the prohibited activity substantially affects interstate commerce.
D. Any Link is Too Attenuated
As was said in Lopez, “[i]n a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far. If Congress attempts that extension, then at the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern.” Lopez, 514 U.S. at 580, 115 S.Ct. 1624 (Kennedy, J., concurring). Any supposed link between the proscribed conduct in FACE and interstate commerce, if one exists, would be so attenuated that it could *273 be used to also justify a general federal police power.
Even assuming that some of the surgical instruments, medications, furnishings and equipment were in interstate commerce at some point, such a connection is so nebulous that it provides no useful boundary under the Commerce Clause. According to Morrison, allowing such remote factors to govern constitutional limitations would allow Congress to “completely obliterate the Constitution’s distinction between national and local authority.” Morrison, — U.S. at-, 120 S.Ct. at 1752.
Persons seeking to block access to abortion climes may be a national problem, but in that sense, rape, robbery and trespass present national concerns as well. Being a mere commonality of the several States does not justify federal regulation of these matters under the auspices of interstate commerce.
The conduct at issue here — blocking access to a building and verbally intimidating those who attempted to enter — is a quintessentially local problem. Despite that obvious and inescapable fact, the federal government chose to use its resources where they were neither required nor appropriate.
Because the prohibited activity has no commercial character and no jurisdictional element need be proved, the statute as drafted impermissibly extends federal jurisdiction over conduct that is purely and simply intrastate and has no relationship in any substantial manner to interstate commerce. Without a jurisdictional prerequisite, FACE leaves the federal government free to intrude into a state’s sovereign duty to maintain order in any abortion clinic-related disturbance, no matter how trivial.
Contrary to the congressional findings, here there was no abdication of responsibility by state authorities. A state court had issued an injunction against obstructing entry to the clinic. On each of the three occasions when the conduct occurred, the local police intervened, arrested protesters, and filed state criminal charges. All of the blockades were controlled by local authorities, including the last one, which caused the local police to seek assistance from neighboring municipalities. The only reported injuries were the result of one demonstrator kicking and head-butting a police officer.
From the standpoint of local law enforcement personnel, the conduct that FACE addresses is not extraordinary, but is akin to disturbances following a high school game between bitter rivals, where fans demonstrate their loyalty in mass unruly gatherings. Celebrations by fans of Super Bowl champions frequently require intervention by city police to maintain order and protect property (some of it undoubtedly in interstate commerce). Near riots at rock concerts by performers who have traveled interstate are routinely controlled by local police forces. Many of the same arguments used to justify FACE could be used to federalize criminal conduct of this nature, despite the competence state authorities have demonstrated over the years.[1]
It is difficult to understand why the federal government invoked FACE when local authorities had the situation well in hand. Duplication of state and federal injunctions wastes judicial resources and leads to uncertainty and confusion. Moreover, overlapping of enforcement authority is detrimental to the federal system and the liberties it secures. “[Cjitizens must have some means of knowing which of the two governments to hold accountable for the failure to perform a given function. ‘Federalism serves to assign political responsibility, not to obscure it.’ ” Lopez, 514 U.S. at 576-77, 115 S.Ct. 1624 (Kennedy, J., concurring) (quoting FTC v. Ticor Title Ins. Co., 504 U.S. 621, 636, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992)). When overlapping occurs, the lines drawn by fed *274 eralism are blurred and the “resultant inability to hold either branch of the government answerable to the citizens is more dangerous even than devolving too much authority to the remote central power.” Id. at 577, 115 S.Ct. 1624 (Kennedy, J., concurring).
FACE is a glaring example of the federalization of local criminal law that is fatally flawed in its implementation because it regulates activities with no commercial character. The statute contains no jurisdictional element which might cabin its operation within the confines of the Commerce Clause, and the congressional findings fail to provide the necessary justification for federal intrusion into local law enforcement.
II. Instrumentalities of Interstate Commerce
The government also argues that FACE may be sustained under the second category noted by the Supreme Court — protection of the instrumentalities of interstate commerce or persons or things in interstate commerce. The Court of Appeals in United States v. Bird, 124 F.3d 667, 674 (5th Cir.1997) concluded that FACE was not sustainable under this second category because no evidence was submitted at trial to support such a conclusion. The Court in Terry v. Reno, 101 F.3d 1412, 1415 (D.C.Cir.1996) simply noted that only the third category was relevant to the case before it.
The Court of Appeals in United States v. Dinwiddie, 76 F.3d 913, 919-20 (8th Cir.1996), considered this second category, observing that the clinic in that case was located in a metropolitan area straddling two states. Because of this, a number of patients and staff members did not live in Missouri where the clinic was located, and therefore, traveled interstate to reach it. Id. On that basis, the court concluded that the statute protected people and business in interstate commerce and so was within Congress’ power to enact under the second category. Id.[2]
Dinwiddie, however, failed to consider the significance of the lack of a jurisdictional hook in FACE, although such absence was a factor in Lopez. It is noteworthy that the two cases cited by the Dinwiddie court to support its holding that the clinic was “in interstate commerce” were based on statutes that did contain jurisdictional limitations. E.g., United States v. American Bldg. Maint. Indus., 422 U.S. 271, 275-76, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975) (Clayton Act); United States v. Robertson, 514 U.S. 669, 670, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (RICO).
I am not persuaded that a purely local commercial service that is frequented by nearby but out-of-state patrons is within the scope of the Commerce Clause without the saving grace of a jurisdictional clause. See Morrison, — U.S. at --- n. 5, 120 S.Ct. at 1752 n. 5.
It is significant that in Lopez, the cases cited in support of the commerce power under the second category involved such matters as the Safety Appliance Act as applied to railroad cars used in intrastate and interstate commerce, Southern Ry. Co. v. United States, 222 U.S. 20, 24, 32 S.Ct. 2, 56 L.Ed. 72 (1911), and fixing intrastate railroad fees that affect interstate rates. Houston, E. & W.T.R. Co. v. U.S., 234 U.S. 342, 345, 34 S.Ct. 833, 58 L.Ed. 1341 (1914). Other examples cited by the Supreme Court include destruction of an aircraft or thefts from interstate shipments. Perez v. United States, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d *275 686 (1971). None of these situations approaches the broad sweep of FACE, which, it must be said again, lacks any jurisdictional limitation to restrict its application to those matters demonstrably in interstate commerce.
III. Fourteenth Amendment
The government also attempts to sustain the statute as a valid exercise of congressional power under the Fourteenth Amendment. Morrison provides a short answer to that contention. The Fourteenth Amendment applies to the states, and like the Violence Against Women Act, FACE is directed at private conduct where there is no indication of state action. Morrison, — U.S. at-, 120 S.Ct. at 1756. FACE, therefore, cannot be sustained under the Fourteenth Amendment.
I conclude that FACE is unconstitutional under both the Commerce Clause and the Fourteenth Amendment. The judgments in this case should be set aside.

. Where state officials are unable to adequately control disturbances with their own resources, 42 U.S.C. § 10501 allows officials to petition the Attorney General for assistance from the federal law enforcement community.

. It is interesting, but not determinative, that in Dinwiddie, the record established the interstate travel of a doctor and some patients. No such findings were made in the case before us. In any event, the Dinwiddie evidence would not cure the facial deficiency in the text of the Act itself. As a criminal statute, it must give notice of the nature of the conduct proscribed, United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954), including jurisdictional facts that must be proved. The fact that the prosecution produces evidence that could satisfy a hypothetical jurisdictional element cannot cure the lack of the material element in the statute itself.