**UNITED STATES of America,**
**Appellee,**

v.

**Patrick J. MAHONEY,**
**et al., Appellants.**

**Nos. 00–5035, 00–5036, 00–5055,**
**00–5090 & 00–5148.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 9, 2001.

Decided May 1, 2001.

Brian Ricardo Chavez–Ochoa argued the cause for appellants. With him on the briefs were Frederick Herbert Nelson, Richard P. Caro, and James Matthew Henderson, Sr.

James Matthew Henderson, Sr. was on the brief for appellant Patrick J. Mahoney. Mark N. Troobnick entered an appearance.

Kevin K. Russell, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Bill Lann Lee, Assistant Attorney General, and Jessica D. Silver, Attorney.

Before: HENDERSON and RANDOLPH, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Separate concurring statement filed by Circuit Judge KAREN LeCRAFT HENDERSON.

RANDOLPH, Circuit Judge:

January 22, 1998, marked the twenty-fifth anniversary of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Individuals from around the country arrived in Washington to participate in the annual "March for Life." Other demonstrations were also planned, including a protest at the Capitol Women's Center, an abortion clinic in Washington. Among those who took part in that protest were the seven individuals who bring this appeal. In a civil action by the United States, the district court found these defendants guilty of violating the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248. The court issued an injunction forbidding the defendants from "[c]oming within a twenty-foot-radius of any reproductive health facility located within" the Capital Beltway. They contest their liability and the scope of the injunction.

I.

On January 23, 1998, one day before the demonstration at the abortion clinic, the defendants attended a rally at a downtown hotel. Defendants Mahoney and Benham announced the demonstration planned for the Capitol Women's Center. Mahoney later alerted the police. The next morning a group led by defendants Benham and Gabriel approached the clinic. The clinic had three entrances, two in the front (the north and south walkways) and another in a back alley. By the time the defendants arrived, volunteers had already created a human chain in front of the clinic to assist staff, patients and other authorized persons who sought to enter the clinic. Four of the defendants (Gabriel, Heldreth, Tyree and White), later joined by defendant Newman, knelt in front of the clinic on the south walkway, bowing their heads and praying.

Shortly thereafter officers of the Washington Metropolitan Police Department cordoned off the front of the clinic with police tape. The enclosed area included both front entrances to the clinic, as well as the main sidewalk along the length of the front of the building. Beginning at 8:15 a.m., police officers issued three warnings to all individuals inside the tape line

that if they did not vacate the cordoned area they would be arrested for incommoding in violation of D.C.CODE ANN. § 22–1107.[1] Mahoney—who until this time had been outside the cordoned area—approached a police officer and asked whether anyone was allowed inside the tape line. The officer told him no. Mahoney then crossed the line, proceeded down the north walkway, knelt near the north clinic door and prayed aloud, expressing his hope that the demonstration would prevent abortions from occurring. The police arrested the individuals inside the cordoned-off area, including the seven defendants. Each was charged with incommoding, and was released after pleading guilty and paying a $50 fine. Throughout the demonstration the clinic continued to treat patients by admitting them through a rear entrance. Although other demonstrators impeded entry through that door, clinic volunteers were able to escort patients into the facility.

The United States later brought this action in federal district court, charging the defendants with violating the Access Act and seeking an injunction (the government dropped its request for civil penalties and statutory damages). After a two-day bench trial, the court ruled in favor of the government and entered a permanent injunction.

## II.

The attorneys for the defendants must think that the more issues they raise, the greater their chance of success. Their briefs squeeze nine issues out of this case, and many more sub-issues. Untenable arguments get equal billing with potentially promising ones. Because every contention is treated equally, none receives much in-depth analysis. We will not be drawn into providing a written response to every one of the defendants' contentions. They have displayed no judgment about what is a good argument and what is a bad one. *See United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir.1993). We hope this opinion will provide some guidance: those defense arguments not specifically addressed have been considered and found so untenable that they do not warrant comment.

### A.

We have sustained the Access Act against a facial constitutional challenge. *Terry v. Reno*, 101 F.3d 1412 (D.C.Cir. 1996). Defendants do not ask for reconsideration of *Terry*. They do claim that the district court erred in finding that they had violated the Act. To make out a violation the government had to prove that the defendants (1) "by physical obstruction," (2) "intentionally" (3) "injure[d], intimidate[d] or interfere[d] with or attempt[ed] to injure, intimidate or interfere with any person," (4) "because that person is or has been ... obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). "[P]hysical obstruction" is defined as "rendering impassable ingress to or egress from a facility that provides reproductive health services ... or render-

---

1. In relevant part, this statute provides: "It shall not be lawful for any person or persons within the District of Columbia to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and engage in loud and boisterous talking or other disorderly conduct, or to insult or make rude or obscene gestures or comments or observations on persons passing by, or in their hearing, or to crowd, obstruct, or incommode, the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or the free entrance into any public or private building or inclosure...."

ing passage to or from such a facility ... unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4). The record leaves no doubt that the government established its case against six of the seven defendants— Benham, Gabriel, Heldreth, Tyree, Newman, and White. Their argument—or more accurately, their bare assertion—is that they did not obstruct or block access to the clinic. The evidence is to the contrary. When they arrived at the clinic, Gabriel, Heldreth, Tyree, Newman, and White knelt or sat within five feet of the south door, the main entrance to the clinic. Benham was pacing just behind them. When the police tried to remove them they offered passive resistance and had to be carried away.

## B.

The seventh defendant, Mahoney, seeks to differentiate himself from the others. He contends that he was familiar with the operation of the Capitol Women's Center, having protested there before, and that as an experienced demonstrator he knew the north walkway led to a locked door. And so he claims that when he crossed over the police tape, walked to the north door, positioned himself three feet from it and prayed aloud he did so without intending to obstruct anyone. The district court found that this door and its connected walkway were "rarely used," that the door served "largely [as] an exit for emergencies" and that it was "generally locked." *United States v. Alaw*, No. 98–1446, mem. op. at 8 (D.D.C. Jan. 21, 2000). The fact that the door was locked, Mahoney argues, meant that it was impossible for him to "render[ ] impassable ingress to or egress from" the facility. 18 U.S.C. § 248(e)(4) (defining "physical obstruction"). He also claims that his selection of the north door shows that he did not intend to obstruct or attempt to obstruct entrance to the clinic,

and was there to express his solidarity with those who were protesting.

■ The district court found that Mahoney interfered or attempted to interfere with ingress or egress from the facility, mem. op. at 28, and that he did so with the requisite specific intent. *Id.* at 30. We may set aside a district court's factual findings only if they are "clearly erroneous." FED.R.CIV.P. 52(a); *United States v. Mathis*, 216 F.3d 18, 26 (D.C.Cir.2000). At trial Mahoney repeatedly stated that he selected the north door of the clinic specifically so he would not interfere with ingress or egress. On direct examination, when asked why he elected to kneel and pray before the north door, he answered: "The reason I chose that [door is] because I know that that door is never used, that no patients or staff ever go in there, so I could be assured that I would not interfere, harass or intimidate or block anyone wanting to use the clinic." The district court refused, however, to credit this "post hoc self-serving explanation." Mem. op. at 30. We have no basis for setting aside what amounted to the district court's assessment of Mahoney's credibility. *Bishopp v. District of Columbia*, 788 F.2d 781, 785 (D.C.Cir.1986). The court also noted that while on the walkway in front of the north door, Mahoney said "let's pray right now for any woman who was thinking about coming here this morning ... as she sees all this going on, oh God, that she would make the decision to save her child ... Father, we pray that even as they come driving down this street and saw the police tape and saw the folks out, that Father they would make the decision for life." Mem. op. at 30. In light of this evidence and the other circumstances of the protest, including Mahoney's organizational role in the event, *id.* at 9, the district court's determination that Mahoney acted

with the requisite specific intent is not clearly erroneous.

■ The question remains whether the government proved the other elements of a statutory violation. The district court found that Mahoney intentionally interfered with persons seeking reproductive care by physically obstructing access to the clinic, or at least attempting to do so. We agree that he accomplished his goal. The fact that Mahoney elected to kneel and pray before a door that was mainly used as an emergency exit does not mean that he did not render ingress or egress "unreasonably difficult" given the circumstances. 18 U.S.C. § 248(e)(4). Mahoney entered the cordoned-off area in part so that he would be arrested with the other demonstrators, and that is precisely what happened. It required fourteen police officers to take Mahoney and the other defendants into custody. In crossing the police line after the officers warned those within the cordoned area that they would be arrested, Mahoney contributed to the disruption and to the interference with those trying to enter or leave the clinic. The Access Act does not limit physical obstruction to bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult. 18 U.S.C. § 248(e)(4); see United ed States v. Soderna, 82 F.3d 1370, 1373 (7th Cir.1996). By contributing to the demonstration within a few feet of the clinic entrances, Mahoney's actions compelled patients to enter the clinic through the "crowded and chaotic" rear entrance. Mem. op. at 24; see United States v. Lindgren, 883 F.Supp. 1321, 1328 (D.N.D.1995). This was a foreseeable and intended consequence of his action, and it constitutes "physical obstruction."

■ Further, Mahoney does not dispute that he used his body to obstruct the north door. While that door was not normally used for ingress, the testimony was that the door was an emergency exit—which is clearly a method of egress. In light of the rash of attacks on women's health clinics, an emergency exit may be a particularly important means of egress. See Terry, 101 F.3d at 1416. The statute does not distinguish between frequently used and infrequently used means of egress, and we decline to write in such a distinction. Accordingly, we affirm the district court's judgment against defendant Mahoney.

## C.

Defendant Tyree also tries to distinguish herself from the other defendants. On the first day of trial, December 14, 1999, Tyree's counsel informed the court that the day before he had reached a settlement with the government on behalf of his client, but that government counsel had backed out that morning. After hearing from the government, the district court judge indicated that she was inclined to send the matter to the magistrate judge to determine whether settlement had in fact been reached. On January 12, 2000, Tyree filed a "Motion Requesting Compliance with Mediation Order," repeating her contention that she had reached a settlement with the government and requesting that the court refer the matter to Magistrate Judge Facciola for resolution. On January 21, 2000, the district court entered an order against Tyree and issued an accompanying memorandum opinion, neither of which addressed her motion. On January 24, 2000, the government filed an opposition to Tyree's motion, denying that any settlement had been reached. Attached to the motion was a copy of a facsimile transmitted to government counsel by Tyree's counsel on December 13, 1999. In part, the facsimile stated that "Ester Tyree [is] willing to accept the terms of settlement we discussed." On February 15, 2000, the

district court issued an order dismissing Tyree's motion as moot. In relevant part, the order states: "Given the fact that judgment was granted ... against Defendant Tyree (who has not appealed that judgment)," the motion is moot. The district court appears to have assumed that the time for appeal had run, and that this failure to take appeal from the judgment mooted Tyree's motion.

■ The district court erred in dismissing the motion as moot. Tyree's notice of appeal had to be filed within sixty days after the district court's order of January 21, 2000. FED. R.APP. P. 4(a)(1)(B). By the date of the court's dismissal order (February 15) that time had not run. Whether parties have reached a settlement is a question of contract law. *Village of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C.Cir.1982); *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir.1995). In the District of Columbia, an enforceable contract exists when there is an agreement about all material terms and an intention of the parties to be bound. *Quijano v. Eagle Maintenance Serv., Inc.*, 952 F.Supp. 1, 3 (D.D.C. 1997). When there is a genuine dispute about whether the parties have entered into a binding settlement, the district court must hold an evidentiary hearing that includes the opportunity for cross-examination. *Autera v. Robinson*, 419 F.2d 1197, 1202–03 (D.C.Cir.1969); *Wilson*, 46 F.3d at 664. The district court here failed to direct such a hearing before the magistrate judge and failed to rule on the merits of Tyree's motion. We therefore must vacate the judgment against Tyree and remand with instructions to determine whether a valid settlement had been reached.[2]

### III.

While we affirm the judgment against all defendants except Tyree, we vacate the injunction as overbroad and violative of the First Amendment. The injunction precludes the defendants from:

1. Standing, sitting, lying, or kneeling in front of entrances to reproductive health facilities, or otherwise physically blockading or obstructing access to reproductive health facilities, located within the boundaries of Interstate 495, popularly known as the Capital Beltway;

2. Attempting, inducing, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraph 1 above, or any actions that would violate the Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248;

3. Coming within a twenty-foot-radius of any reproductive health facility located within the boundaries of Interstate 495;

4. "Reproductive health facility" means any hospital, clinic, physician's office, or other facility that provides medical, surgical, counseling, or referral services relating to the human reproductive system, including services relating to pregnancy, or the termination of pregnancy. 18 U.S.C. § 248(e)(1 & 5).

■ Injunctions against speech have long been disfavored. *See Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Some legal historians believe that the essential purpose of the First Amendment was to banish such prior restraints. Actions for injunctions are equitable and so no jury is present, unlike

---

2. We wish to make clear that we have considered defendant Tyree's other claims and rejected them. To the extent that she did not enter into a settlement with the government, we would affirm the judgment against her.

criminal prosecutions for speech already given. The burden of proof is also different. And because of the rule of *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), those subject to injunctions, even invalid injunctions, must comply until the injunction is overturned on appeal. The unconstitutionality of an injunction is no defense to a contempt prosecution. Despite these considerations the Supreme Court has decided not to use prior restraint analysis to determine the validity of injunctions regulating anti-abortion protestors, at least when the injunctions are based on past violations by those subject to the court's decree. *See Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 763 n. 2, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994); *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 374 n. 6, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). "Content-neutral" injunctions are to be tested under the First Amendment by determining "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516.

The significant government interests here are about the same as those spelled out in *Schenck:* "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services," 519 U.S. at 376, 117 S.Ct. 855. The question, then, is whether the injunction burdens "more speech than necessary." *Madsen,* 512 U.S. at 765, 114 S.Ct. 2516.

■ The injunction prohibits the defendants from coming within a twenty-foot radius of any facility inside the Capital Beltway that provides counseling, medical or referral services "relating to the human reproductive system." Although the defendants have not challenged the geographic scope of the injunction (*compare Schenck,* 519 U.S. at 366 n. 3, 117 S.Ct. 855, which upheld an injunction for the entire Western District of New York) or its lack of any temporal limits, there are other problems. The buffer zone is fixed at twenty feet, *compare Schenck,* 519 U.S. at 367, 117 S.Ct. 855, but it lacks the necessary correlation between the provision and the government interests. The language defining a covered facility is extraordinarily broad. On its face, the injunction would preclude a female defendant from visiting the offices of a gynecologist or obstetrician, even for the purpose of receiving medical care. It would preclude the defendants from visiting any place of religious worship where "counseling" is provided to pregnant women considering an abortion. To give another example, it would preclude the defendants from volunteering at an Operation Rescue facility in the District of Columbia where they could counsel individuals to carry a pregnancy to term. Such burdens on speech are unrelated to the interests in public order and unimpeded access to medical care reflected in the Access Act.

We are also concerned that the injunction could be violated unknowingly. Whenever a defendant wandered within twenty feet of a covered facility he would be in technical violation of the injunction. The injunction contains no intent requirement. Yet we cannot see how this sort of liability without fault is necessary to promote the government interests the Supreme Court identified. Some element of intent must be inserted in the injunction in order to avoid curtailing legitimate activities like walking down the street.

There is another problem. No one can be sure how the injunction applies when the covered facility is in a multi-story building. Would it be a violation of the injunction if a defendant visited a different

office within the same building? From what point does one measure the twenty feet—the doctor's office, or the entire structure? At oral argument counsel for the government assured us that the district court meant the office to be the point of measurement, but the record leaves the subject in considerable doubt. To avoid chilling legitimate speech, the question must be clarified. *Cf. Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 2510, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting).

We do not reject the proposition that an injunction may be appropriate in this case to ensure that women in the Washington, D.C. metropolitan area can continue to exercise their constitutional rights. But this injunction is considerably overbroad. *Compare Schenck,* 519 U.S. at 366 n. 3, 117 S.Ct. 855. We therefore vacate the injunc-tion and remand this case to the district court.

*Affirmed in part, vacated in part, and remanded.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

I concur in the majority opinion except that I would strike the first paragraph of Part II and in its place add the following final sentence to the opinion:

The appellants' remaining arguments are without merit and warrant no discussion.