**Terry F. GREENE, Plaintiff,**

v.

**Donald H. RUMSFELD, Defendant.**

**Civil Action No.: 01–1429 (RMU).**

United States District Court,
District of Columbia.

June 9, 2003.

June Dorothy Kalijarvi, Kalijarvi, Chuzi & Newman, P.C., Washington, DC, for Plaintiff.

Lisa Sheri Goldfluss, Secretary of Defense, U.S. Attorney's Office, Washington, DC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

URBINA, District Judge.

#### GRANTING THE DEFENDANT'S MOTION TO ENFORCE SETTLEMENT

### I. INTRODUCTION

This employment-discrimination matter comes before the court on the defendant's oral motion to enforce the settlement agreement that defendant Donald Rumsfeld, Secretary of Defense, believes the parties reached during settlement discussions. Plaintiff Terry F. Greene, an employee of the Defense Intelligence Agency ("DIA" or "the agency") of the Department of Defense ("the Department"), contends that the parties did not reach a final settlement agreement. On April 30, 2003, the court held a hearing at which the parties presented testimony as to whether they had arrived at a final settlement agreement. Resolving all issues of fact in favor of the defendant, the court concluded that the parties had reached a final settlement agreement that required the plaintiff to retire immediately. The court thus granted the defendant's motion to enforce the settlement. The court now sets forth its findings of fact and conclusions of law.

### II. BACKGROUND

#### A. The Plaintiff's Factual Allegations

The plaintiff, a colonel in the United States Army Reserve, was a grade GS–14 Senior Security Officer assigned to the Security Operations Division of the Counterintelligence and Security Activity Directorate for Administration at DIA. Compl. ¶¶ 7, 11. In June 1998, the defendant issued a vacancy announcement for the grade GS–15 position of Supervisory Security Officer/Division Chief of the Security Operations Division ("Division Chief"). *Id.* ¶ 8. The announcement identified several skill areas required for the Division Chief position: comprehensive knowledge of the intelligence community; knowledge of foreign intelligence services' methods of operation; knowledge of the defendant's planning, programming and budgeting processes; ability to analyze and resolve complex policy and procedure issues;

knowledge of military and civilian personnel management and training; and communications skills. *Id.* ¶ 9.

Having held multiple supervisory assignments for which he received outstanding evaluations and having completed advanced training in intelligence and counterintelligence, the plaintiff applied for the Division Chief position. *Id.* ¶¶ 10–12. Of the eight applicants, he was the only African–American from within DIA and the only applicant who had engaged in protected equal employment opportunity ("EEO") activity. *Id.* ¶ 12. In August 1998, the selection panel appointed to review the applications determined that the plaintiff did not fit the requirements of the position, and did not select him to be interviewed by the selecting official. *Id.* ¶¶ 13–14. After the plaintiff brought the panel's determination to the attention of high-level DIA officials, the defendant replaced one of the selection panel members, and the panel selected the plaintiff and three white applicants for the selecting official to interview. *Id.* ¶¶ 15, 17, 19, 22. In September 1998, the selecting official interviewed the plaintiff and, in his notes, evaluated the plaintiff as the most qualified for the position. *Id.* ¶ 24.

Over the next two months, however, the defendant took no action to select one of the four applicants for the Division Chief position. *Id.* ¶ 25. In November 1998, the defendant canceled the vacancy announcement, opting instead to conduct a review of the division's organization. *Id.* ¶ 26. On January 21, 1999, the plaintiff requested and received a three-month rotation in the vacant Division Chief position. *Id.* ¶ 28. In May 1999, the defendant announced that a "senior executive" from the Central Intelligence Agency ("CIA") would fill the Division Chief position on a temporary two- or three-year basis. *Id.* ¶¶ 29–30. According to the plaintiff, however, the CIA employee chosen to fill the position had no knowledge of or experience with the defendant's operations. *Id.* ¶ 30.

During this period, the plaintiff experienced several personnel actions. First, in November 1998, the official who conducted the organizational review requested an investigation of the plaintiff, alleging that the defendant had committed misconduct by "bragg[ing] about getting a GS–14 by filing an EEO complaint and that he was about to get his GS–15 the same way." *Id.* ¶ 27. The defendant rejected the official's request as unfounded. *Id.* Second, in July 1999, the defendant nominated but did not select the plaintiff—the only black nominee and the only nominee who had engaged in protected EEO activity—as one of 20 employees who received DIA's highest award for civilian service. *Id.* ¶ 31. In September 2001, the defendant removed several of the plaintiff's principal duties as leader of a task force and participant in a mission. *Id.* ¶ 33. Finally, in February 2002, the plaintiff received an "Exceeds Fully Successful" performance appraisal, the lowest rating the plaintiff had received since 1993. *Id.* ¶ 32.

### B. Procedural History

On June 27, 2001, the plaintiff filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that the defendant discriminated against him on the bases of race and gender, and in retaliation for prior protected EEO activity. On March 18, 2002, after the defendant filed its answer, the court held an initial status hearing at which the court issued a briefing schedule and referred the case to United States Magistrate Judge John M. Facciola for settlement discussions. Order dated Mar. 18, 2002. On April 12, 2002, the plaintiff filed an amended complaint adding to his retaliation claim the defendant's September 2001 removal of several of the plaintiff's duties and the

defendant's February 2002 evaluation of the plaintiff. Am. Compl. ¶¶ 32–33.

On April 30, 2003, at the defendant's request, the court held a hearing on the defendant's oral motion to enforce settlement, taking evidence on the question of whether the parties had arrived at an enforceable settlement agreement. The defendant argued that the parties had reached an enforceable agreement, of which an essential component was the plaintiff's immediate retirement from the DIA. The plaintiff countered that because the parties had yet to negotiate a date for the plaintiff's retirement under the agreement, they had not reached an enforceable final agreement.

At the hearing, the court heard testimony from Magistrate Judge Facciola, defendant's counsel Assistant United States Attorney Lisa S. Goldfluss, agency counsel Commander Robert Schapler, plaintiff's counsel June Dorothy Kalijarvi, and the plaintiff. Based on evidence presented during the hearing, and resolving all issues of fact in favor of the defendant, the court concluded that the parties reached a final agreement on March 31, 2003, and that the agreement required the plaintiff's immediate retirement from DIA. Having issued an order on April 30, 2003 granting the defendant's motion to enforce settlement, the court now sets forth its Findings of Fact and Conclusions of Law, including but not limited to the following:

### III.  FINDINGS OF FACT

#### A.  The Settlement Discussions

6.  At the time of the events giving rise to this dispute, the parties had been conducting settlement discussions for eight months, beginning in July 2002. Tr. of Apr. 30, 2003 Mot. Hr'g on Enforcement of Settlement Agreement ("Tr.") at 5, lines 17–20 (hereinafter formatted as page/lines), 9/22–24, 43/1–10. Specifically, Magistrate Judge Facciola presided over formal settlement discussions with the parties and their counsel in July and October 2002, and then again in March 2003. *Id.* at 43/1–12.

7.  According to the defendant's counsel, early settlement efforts had failed primarily because both parties were "unambiguous" about their desires: the plaintiff was unambiguous about being promoted to grade GS–15, while defendant was unambiguous about refusing to grant the plaintiff such a promotion. *Id.* at 9/22–10/7.

#### B.  The Buyout Opportunity

8.  In early 2003, plans to reorganize DIA personnel and duties and to eliminate certain positions presented a new possibility for settlement. *Id.* at 10/10–21, Attach. ("Feb. 7 Mem.") to Pl.'s Ex. 1. On February 7, 2003, the Office of Human Resources sent a memorandum ("February 7th Memorandum") to the plaintiff and 78 other employees indicating that their positions had been identified for elimination in the reorganization, and that as a result they had the opportunity to take a "special workforce restructuring buyout." Tr. at 10/16–21, 62/8–23; Feb. 7 Mem. ¶ 2. The buyout represented an agreement between the agency and the employee that the employee would accept a $25,000 payment ("the separation incentive") in exchange for the employee's early retirement. Tr. at 12/11–13/5, 19/19–22; Def.'s Ex. 1 ¶¶ 3, 5. The buyout included an explicit requirement that any employee approved for the buyout "must be separated

from DIA roles by [close of business] on March 31, 2003."[1] Tr. at 11/9–14; Feb. 7 Mem. ¶ 2.

9. At or around the time that the buyout program was announced, DIA advised the defendant's counsel that the buyout program represented a new opportunity to craft a settlement agreement in this case. Tr. at 10/10–21, 58/1–4. The agency counsel sent the defendant's counsel a series of settlement options that, for the first time since discussions started, included the concept of the plaintiff's retroactive promotion to a grade GS–15, as long as it was "tied irrevocably to the concept of his retirement." *Id.* at 12/3–10, 58/5–10. This coupling of a retroactive GS–15 promotion and the plaintiff's retirement via the buyout eventually provided "the backbone of the [defendant's] settlement offer." *Id.* at 12/8–10.

10. On February 14, 2002, the defendant's counsel faxed to the plaintiff's counsel a letter setting forth a settlement offer premised on and explicitly referencing the February 7th Memorandum. *Id.* at 34/23–35/10; Pl.'s Ex. 1. Pursuant to the offer, the plaintiff would receive a retroactive promotion for a period of three years and "would take the $25,000 buy-out referenced in paragraph 2 of the February 7, 2003 Memorandum that he received from Frederick G. Wong, Chief, Office for Human Resources, and would retire *no later than 31*

*March 2003.*" Pl.'s Ex. 1 at 1 (emphasis added). The letter closed by emphasizing the buyout's March 31, 2003 separation deadline. *Id.* at 2.

11. At some point in the discussions between February 14 and March 31, 2003, "in view of the fact that things were going so quickly and that papers needed to be processed," the defendant's counsel conferred with the agency counsel about DIA's flexibility under the buyout regarding the date on which the plaintiff would have to retire. Tr. at 11/15–19. The agency counsel explained that the plaintiff would have to elect the buyout by March 31, 2003, but that if the parties could not procure a written, court-approved settlement agreement by that date, the plaintiff's retirement could take place shortly thereafter. *Id.* at 11/20–25. The defendant's counsel passed that information along to the plaintiff's counsel, who understood that the agency was going to "save a place on the table for Terry" so that the parties could continue to negotiate. *Id.* at 36/22–38/5, 63/1–12, 83/17–25, 84/8–14.

12. On March 20, 2003, the parties and their counsel appeared for an unsuccessful mediation session with Magistrate Judge Facciola. *Id.* at 15/10–13, 82/3–17. On March 25, 2003, with no settlement agreement concluded, the defendant's counsel

---

1. The February 7th Memorandum states that the buyout authority is used

to restructure the workforce by reshaping positions vacated as a result of the buyout/early retirement to meet mission needs, achieve one or more reductions in strength, correct skills imbalances, or reduce the

number of high grades, managerial, supervisory or other similar positions.

Feb. 7 Mem. ¶ 1. The agency counsel testified that all employees approved for the buyout program are now separated from DIA roles. Tr. at 63/18–20.

phoned the plaintiff's counsel to advise her that the plaintiff's ability to elect the buyout would expire on March 31, 2003. *Id.* at 36/16–24. According to the plaintiff's counsel, she and the defendant's counsel discussed a then-pending settlement offer that included the $25,000 separation incentive from the plaintiff's retirement under the buyout; a payment of approximately $130,000 to cover compensatory damages, back pay, and attorneys' fees; and the retroactive GS–15 promotion. *Id.* at 83/7–11. Subsequently, and again premised on the plaintiff taking the buyout and retiring, the defendant made another offer ("the package offer") of the $25,000 separation incentive, a $135,000 payment for compensatory damages and attorneys' fees, the retroactive GS–15 promotion, and a separate payment of back pay and back benefits for the three-year period of the retroactive promotion. *Id.* at 15/14–16/16.

13. During subsequent discussions on the package offer, the plaintiff's counsel asked the defendant's counsel about the date on which the plaintiff would be expected to retire. *Id.* at 36/25–37/3. The defendant's counsel explained that, for purposes of consummating settlement, the agency could arrange for the plaintiff to submit his retirement papers after the March 31 deadline, but that the plaintiff had to exercise the buyout option by the March 31 deadline. *Id.* at 37/4–38/5. The defendant's counsel also explained that consistent with the February 7th Memorandum, DIA had been allocated a limited number of buyout authorizations, and that once the number of inter-ested employees had exceeded the limit, buyout authority would be depleted and no further buyout money would be available. *Id.* at 83/6; Feb. 7 Mem. ¶ 2.

14. Toward the end of March 2003, the defendant's counsel sent the package offer to the plaintiff's counsel. Tr. at 16/20–21. In response, the plaintiff's counsel proposed an additional term: that the plaintiff be permitted to retire effective February 2004 to avoid an early-retirement penalty in his retirement annuity payments. *Id.* at 16/20–23, 84/20–24. After conferring with the agency, the defendant's counsel made clear to the plaintiff's counsel that "the agency was adamant that [the plaintiff] retire now," and informed the plaintiff's counsel that if the plaintiff insisted on a February 2004 retirement, the retroactive GS–15 promotion was "off the table." *Id.* at 16/24–17/7, 84/25–85/21, 86/9–14.

15. Concerned that the efforts to reach a deal were coming apart, the defendant's counsel called Magistrate Judge Facciola for assistance, explaining that she believed the plaintiff "was not seeing the economics right" given the cash and other benefits he would receive by "retir[ing] as a GS–15 now" under the package offer rather than retiring as a GS–14 in January or February 2004 without the package offer. *Id.* at 17/8–18, 88/8–14. Both parties' counsel believed that it would be helpful for Magistrate Judge Facciola to speak with the plaintiff. *Id.* at 17/20–23, 90/17–19. Magistrate Judge Facciola phoned the plaintiff and had a frank discussion of the economic interests associated

with the plaintiff's decision on the package offer, namely, the economics of retiring now as a GS–15 with the $25,000 separation incentive rather than retiring in February 2004 as a GS–14 with no separation incentive. *Id.* at 5/20–22, 6/10–7/18, 45/3–21. The plaintiff told Magistrate Judge Facciola that he would think about it. *Id.* at 7/21–22, 17/24–18/1.

## C. The Settlement Agreement

16. On March 31, 2003, the plaintiff's counsel phoned the defendant's counsel and told her that the plaintiff had authorized her to state that he would drop his demand to retire in February 2004 and take the package offer if the defendant added another $20,000 to the $135,000 already included in the package offer. *Id.* at 18/2–14, 89/22–25, 90/20–91/2, 105/10–25. The defendant's counsel immediately called the agency counsel to ask whether "we were going to be able to make this work." *Id.* at 18/23–24. After talking to agency officials, the agency counsel indicated that the defendant would agree to the additional $20,000 if it would settle the case. *Id.* at 18/25–19/7, 59/22–25. With the agency counsel still on the phone, the defendant's counsel immediately conferenced in the plaintiff's counsel to announce that the defendant had agreed to the additional $20,000 and that "we have a deal." *Id.* at 19/9–14. The defendant's counsel then reviewed the material terms of the agreement: the plaintiff would take the buyout

and receive the $25,000 separation incentive, a $155,000 payment to cover compensatory damages and attorneys' fees, and a promotion to GS–15 retroactive for three years, including the corresponding sums for back pay and back benefits. *Id.* at 19/14–18, 60/5–14.

17. The parties' counsel, who were "very excited" and "relieved" about reaching an agreement, immediately conferenced in Magistrate Judge Facciola to inform him that they had reached a settlement, and to thank him for his assistance. *Id.* at 21/6–23/3, 95/17–21. From this call, Magistrate Judge Facciola understood "unequivocally" that the parties had settled the case. *Id.* at 5/12–14. Magistrate Judge Facciola congratulated the parties' counsel on their efforts and indicated that he would contact this court to indicate that the parties had settled and that a written settlement agreement would follow. *Id.* at 23/4–9, 47/2–4.

## D. The Subsequent Dispute

18. During the March 31 conference call, the parties' counsel agreed that the defendant's counsel would draft the agreement and send it to the plaintiff's counsel. *Id.* at 25/1–4, 95/22–25, 97/1–3. Over the next several days, the defendant's counsel worked with the agency counsel to obtain the necessary information and "figure out the logistics of how this was going to come together."[2] *Id.* at 24/1–5, 25/5–14. On April 18,

2. The defendant's counsel testified, for example, that she needed to work with the agency counsel to verify the official name of the buyout program, and to find a title for the newly created GS–15 position into which the defendant was to retroactively promote the plaintiff. *Id.* at 25/5–14.

2003, the defendant's counsel faxed to the plaintiff's counsel a draft agreement reflecting all of the material terms reviewed during the March 31 conference call. *Id.* at 24/1–5, 25/5–14; Def.'s Ex. 1. Paragraph 2 of the draft agreement stated that the defendant agreed to promote the plaintiff to a GS–15 position of Senior Security Officer, retroactive to February 13, 2000, effective on the date of the court's approval of the agreement. Def.'s Ex. 1 ¶ 2. Paragraph 3 of the draft agreement then stated that:

[i]mmediately upon the approval and filing of this Stipulation of Settlement and Order of Dismissal by the Court, Plaintiff shall retire from the federal government *effective May 3, 2003*, pursuant to the VSIP/VERA program for fiscal year 2003, and shall receive from the Department, accordingly, a separation incentive of $25,000 under that program.

*Id.* ¶ 3 (emphasis added).[3]

19. To this point, it appears that neither the parties nor their counsel had mentioned a specific retirement date.[4] Tr. at 40/8–13, 49/19–22, 51/2–5, 67/19–23, 86/15–87/4, 104/19–20. The May 3, 2003 retirement date in the draft agreement arose from assumptions about the amount of time needed to allow for the agreement's approval. *Id.*

25/15–23. More specifically, May 3, 2003 was the last day of the pay period in which the defendant's counsel reasonably believed the settlement agreement was likely to be executed by the parties and the court. *Id.* 25/15–23, 40/10–13.

20. Within a few days of receiving the draft agreement, the plaintiff's counsel left a voicemail message for the defendant's counsel indicating that there were two problems with the draft agreement: first, that the plaintiff wanted to retire in mid-June so that he could take his military leave, and second, that the draft agreement did not include a provision restoring more than 100 hours of leave that the plaintiff had requested as part of his settlement demand. *Id.* at 26/15–21. That phone call was followed by an April 23, 2003 letter from the plaintiff's counsel to the defendant's counsel reiterating the two problems and identifying June 15, 2003 as the plaintiff's desired retirement date. *Id.* at 27/6–19; Def.'s Ex. 2.

21. After receiving the letter, the defendant's counsel called the plaintiff's counsel to say that there had been no agreement on leave and that "the retirement was not supposed to be on June 15th, it was supposed to be now." Tr. at 27/20–

---

**3.** Completing the key elements of the settlement, Paragraph 5 of the draft agreement stated that the defendant would pay the plaintiff $155,000—the $135,000 of the package offer plus the additional $20,000 requested by the plaintiff—for costs, attorneys' fees, and compensation. Def.'s Ex. 1 ¶ 5.

**4.** The defendant's counsel testified that although she understood that the plaintiff's counsel did not recall the conversation, she had called the plaintiff's counsel prior to fax-

ing the draft agreement and said "I just want to let you know that the effective date of retirement is May 3rd." Tr. at 25/15–26/3. The plaintiff's counsel denied that such a conversation took place, and testified that she first became aware of the May 3 date when she received the fax of the draft agreement. *Id.* at 98/1–10. Because the existence of this alleged conversation does not affect the court's analysis, the court does not address the point further.

24, 100/7–9. After checking with the agency counsel, the defendant's counsel again called the plaintiff's counsel and told her that the agency would agree to additional leave,[5] but that the retirement date could not change. *Id.* 28/11–3. When the plaintiff's counsel came back with a proposal that the plaintiff retire at the end of the pay period closest to June 17, the defendant's counsel indicated that she "thought this was a real problem" and that they should call Magistrate Judge Facciola. *Id.* at 28/14–29/1, 100/5–9. The defendant's counsel also stated that she believed that the defendant would be well within its rights to move to enforce the settlement agreement and that it was "outrageous" that the plaintiff was asking for more when the parties had already reached agreement. *Id.* at 29/2–15.

22. The defendant's counsel contacted Magistrate Judge Facciola and told him that there were serious problems that needed to be dealt with quickly. *Id.* at 32/16–33/9, 47/22–48/9. Magistrate Judge Facciola rearranged his schedule and met with the parties and counsel on April 29, 2003 in an effort to resolve the problem, but that effort was not successful. *Id.* at 33/9–12, 48/10–49/8.

### E. The Parties' Understanding

23. Magistrate Judge Facciola, who had "intensive involvement" in this case and had presided over all formal settlement discussions, had a firm sense of the parties' mutual understanding of the timing of the plaintiff's retirement under the settlement agreement. *Id.* at 4/14–16, 5/17–20, 49/17–51/15. He clearly understood that "[t]he government had unequivocally rejected Mr. Greene's request or at least his offer that he remain in government service and retire in February. They were only willing to offer the GS–15 if he would go immediately." *Id.* at 46/1–7. In Magistrate Judge Facciola's mind, "[i]t wasn't a question of 'soon'.... [T]he point was he's got to go. I mean, at one point I think—in fact, in my handwritten notes I used that phrase, 'Got to go.' " *Id.* at 50/23–51/1. Finally, Magistrate Judge Facciola specifically understood that "it was the mutual understanding of the parties that the entire agreement was conditioned upon Mr. Greene's immediate retirement. It was, as I said, Judge, no go if he did not retire immediately." *Id.* at 51/7–15.

24. After the defendant had made its package offer and the plaintiff had proposed that he be allowed to retire in February 2004, the defendant's counsel explained to the plaintiff's counsel that "the agency was adamant that [the plaintiff] retire now." *Id.* at 17/5–7. She believed that in the context of the extensive settlement discussions, it was clear that the agency would not consider the retroactive GS–15 promotion "unless Mr. Greene was not ... in the agency." *Id.* at 20/3–19.

---

5. The parties had not agreed on restoration of the plaintiff's leave during the March 31 conference call. *Id.* at 27/14–22, 31/9–32/6, 91/5– 14, 93/1–5. Rather, the defendant agreed to give the plaintiff an additional 100 hours of leave without consideration. *Id.* at 32/2–13.

25. The agency's position throughout the negotiations was that "Terry Greene should leave the agency and leave it immediately." *Id.* at 57/20–25. As the agency counsel noted, "during the course of those negotiations, the agency switched from a position of saying they would not provide a promotion to [GS-]15, retroactive or otherwise, to ultimately, in an effort to secure the immediate requirement, authorizing a retroactive promotion to GS–15." *Id.* at 58/5–10.

26. The plaintiff participated in all phases of the litigation, appeared before Magistrate Judge Facciola during settlement discussions, was kept apprised by his counsel of all settlement discussions at which he was not present, granted his counsel the authority to negotiate a settlement agreement, and was aware that on March 31 his counsel had indicated to the defendant that there was a deal. *Id.* at 67/8–18, 70/17–71/1, 74/18–21, 79/7–11, 80/1–14. In his frank discussion with Magistrate Judge Facciola, the plaintiff discussed the economic benefits of retiring immediately, rather than in January or February of 2004. *Id.* at 75/14–18. The plaintiff knew that the defendant "wanted [him] out the door" and that "[e]verybody said that [and t]hat's been their intention," notwithstanding his view that the de-

fendant's acceptance of the additional $20,000 signified that he could retire any time before February 2004. *Id.* at 78/4–21. The plaintiff learned that his retirement was a condition to settlement when he saw the defendant's February 14, 2003 letter offering settlement conditioned on the plaintiff's retirement.[6] *Id.* at 71/16–17, 73/9–74/14.

27. During the March 31 conference call, the plaintiff's counsel asked the defendant's counsel and the agency counsel when the plaintiff was expected to retire, and the answer was "As soon as the paperwork is completed," with an estimate of 30 to 60 days. *Id.* at 93/25–94/3, 104/10–12. At the time of the March 31 conference call, the plaintiff's counsel had not had a discussion with the plaintiff regarding his retirement date, and it was not until April 22, 2003 that she learned of the plaintiff's desire to delay his retirement until June 15, 2003. *Id.* at 95/8–13, 99/12–19.

## IV. CONCLUSIONS OF LAW

▉ The party asserting the existence of an enforceable contract bears the burden of proof on the issue of contract formation. *E.g., Novecon Ltd. v. Bulgarian Am. Enter. Fund,* 190 F.3d 556, 564 (D.C.Cir.1999). State contract law governs the enforcement of settlement agreements.[7] *Makins v. District of Columbia,*

---

6. The plaintiff offered conflicting testimony as to when he learned that his retirement was a condition to settlement, first stating that it was not until March 31, 2003, and in the next breath stating that he saw the defendant's February 14 letter (which conditioned settlement on his retirement) before March 31, 2003. Tr. at 71/16–17, 73/9–74/14. When asked by the court to explain these conflicting

statements, he said that it was "[j]ust a mistake on my part." *Id.* at 74/13–14.

7. Settlement agreements are highly favored by the courts. *E.g., Schneider v. Dumbarton Developers, Inc.,* 767 F.2d 1007, 1015 (D.C.Cir.1985) (citing *Williams v. First Nat'l Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910)). Settlement of Title VII claims is particularly encouraged, given the

277 F.3d 544, 547 (D.C.Cir.2002). The defendant therefore carries the burden of proving that the agreement satisfies the elements of an enforceable contract under District of Columbia law. *Novecon,* 190 F.3d at 564.

■■■ In the District of Columbia, an enforceable contract exists when there is an agreement as to all the material terms and an intention of the parties to be bound. *United States v. Mahoney,* 247 F.3d 279, 285 (D.C.Cir.2001). Accordingly, the parties to a settlement agreement "must intend the words and acts which constitute their manifestation of assent." *Simon v. Circle Assocs., Inc.,* 753 A.2d 1006, 1012 (D.C.2000). Mutual assent "is most clearly evidenced by the terms of a signed written agreement, but such a signed writing is not essential to the formation of a contract. The parties' acts at the time of the making of the contract are also indicative of a meeting of the minds." *Davis v. Winfield,* 664 A.2d 836, 838 (D.C. 1995); *see also Sturdza v. United Arab Emirates,* 281 F.3d 1287, 1301 (D.C.Cir. 2002).

■■■ If there is a dispute as to the interpretation of a contract, the court's "first step . . . is determining what a reasonable person in the position of the parties would have thought the disputed language meant." [8] *Sagalyn v. Found. for Pres. of Historic Georgetown,* 691 A.2d

107, 111 (D.C.1997) (quoting *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 32 (D.C.1982)). "The objective reasonable person assessing the contract's language is presumed to know all the circumstances before and contemporaneous with the making of the agreement . . . and extrinsic evidence is admissible to determine the nature of those circumstances." [9] *Patterson v. District of Columbia,* 795 A.2d 681, 683 (D.C.2002).

Applying the law to the factual findings set forth above, the court concludes that the defendant has shown by the parties' words and acts that (1) the parties reached an enforceable agreement, and (2) under that agreement, a reasonable person would have understood that the plaintiff was to retire immediately.

### A. The Parties Reached an Enforceable Settlement

■■■ It is clear from the facts in the record that during the March 31 conference call, the plaintiff's counsel, the agency counsel, and the defendant's counsel reached an enforceable oral agreement incorporating all material terms and evidencing an intent of the parties to be bound. *Mahoney,* 247 F.3d at 285. The agreement included all material terms, including the "backbone" term of the retroactive GS–15 promotion coupled with the plaintiff's retirement under the buyout (ac-

"strong [congressional] preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. Am. Brands,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). Not surprisingly, then, "[d]ecisions emphasizing the preferred role of settlements under Title VII are legion." *Stewart v. Rubin,* 948 F.Supp. 1077, 1086 (D.D.C. 1996) (quoting *Luevano v. Campbell,* 93 F.R.D. 68, 85 (D.D.C.1981)).

8. "This reasonableness determination involving an evaluation of the surrounding circumstances is to be applied whether the contract's

language appears ambiguous or not." *Patterson v. District of Columbia,* 795 A.2d 681, 683 (D.C.2002).

9. "[A]lthough extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous, extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract so that it may be ascertained what a reasonable person in the position of the parties would have thought the words meant." *Christacos v. Blackie's House of Beef, Inc.,* 583 A.2d 191, 194 (D.C.1990).

companied by the $25,000 separation incentive), plus the $155,000 compensatory-damages and attorneys'-fees payment, and the retroactive GS–15 promotion with back pay and back benefits. Moreover, acting through their counsel,[10] the parties clearly evinced an intent to be bound by the agreement. The parties' counsel described themselves as excited and relieved to have reached agreement, and at the end of the March 31 conference call immediately conferenced in Magistrate Judge Facciola to announce the agreement and to thank him for his efforts. In light of the strength of the evidence presented, therefore, the court determines that the parties reached an oral agreement that incorporated all material terms. *Mahoney*, 247 F.3d at 285.

**B. Under the Agreement, A Reasonable Person Would Have Understood That the Plaintiff Was to Retire Immediately**

■ With regard to the plaintiff's retirement, the court concludes that from the circumstances leading to settlement, a reasonable person in the position of the parties would have understood that the plaintiff was to retire immediately. *Sagalyn*, 691 A.2d at 111; *Patterson*, 795 A.2d at 683. Throughout the settlement discussions, the defendant through its counsel consistently expressed its desire for the plaintiff to leave the agency immediately.

The defendant's change of heart on the plaintiff's retroactive GS–15 promotion came only after the defendant saw the opportunity to secure the plaintiff's immediate retirement under the buyout—a coupling that served as the backbone of the defendant's package offer and ultimately, the settlement. Moreover, in rejecting the plaintiff's proposal that he retire in February 2004, the defendant's counsel reiterated to the plaintiff's counsel that her client was adamant that the plaintiff retire "now." The plaintiff himself knew as early as February 14 that his retirement was a condition of settlement, and testified that he knew—in fact, "everybody" knew—that the defendant wanted him "out the door." Indeed, Magistrate Judge Facciola, whose testimony the court finds particularly compelling, confirmed "[t]hat it was the mutual understanding of the parties that the entire agreement was conditioned upon Mr. Greene's immediate retirement. It was, as I said, Judge, no go if he did not retire immediately." In short, the court concludes that all involved in the settlement discussions had a clear understanding that the plaintiff was expected to leave, and leave immediately.

As for the effective retirement date—or, put another way, the implementation of the plaintiff's immediate retirement—the circumstances demonstrate that immediate retirement meant as soon as logistically possible. *Patterson*, 795 A.2d at 683. Throughout the March–April period,

---

**10.** The authority of the plaintiff's counsel to enter into a binding agreement on March 31, 2003 on behalf of the plaintiff is undisputed. "In run-of-the mill contract cases, the D.C. Court of Appeals relies on § 27 of the Restatement (Second) of Agency to determine whether an agent has the authority to enter into a binding agreement on behalf of the principal." *Makins*, 277 F.3d at 548. Under District of Columbia law, therefore, an agent has actual authority if she has the power "to affect the legal relations of the principal by acts done in accordance with the principal's

manifestations of consent to him." *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 7). Here, the plaintiff testified that he had granted his counsel the authority to negotiate a settlement agreement, and the plaintiff's counsel testified that the plaintiff authorized her to state that he would take the package offer if the defendant added another $20,000 to the $135,000 already included in the offer. Accordingly, on March 31, 2003, the plaintiff's counsel had express actual authority to enter into a binding settlement on those terms.

the defendant consistently predicated the retirement date on the earliest possible moment by which the retirement and settlement paperwork could be completed. Initially, the defendant offered a retirement date of March 31, the separation date under the buyout program. Only when it became clear that the settlement could not be consummated and the requisite paperwork processed by March 31 did the agency counsel obtain a special dispensation for the plaintiff to retire after the buyout's deadline. After the parties consummated the settlement on March 31, the defendant's counsel needed time to work with agency counsel to resolve logistical details associated with the settlement. Once they resolved those details, the defendant's counsel faxed to the plaintiff's counsel the draft agreement, which set forth a retirement date of the last day of the pay period in which the parties and the court were likely to execute the agreement. In short, each action taken by the defendant since the buyout possibility first arose demonstrates the defendant's continued focus on the plaintiff's departure at the earliest possible moment.

Nor was the plaintiff in the dark on this point. When the defendant's counsel told the plaintiff's counsel that the buyout's March 31 retirement deadline had some flexibility, the plaintiff's counsel understood that the agency was saving a place at the table for the plaintiff solely to allow the parties to continue negotiating. Once the parties reached agreement, the defendant's counsel informed the plaintiff's counsel that the plaintiff was expected to retire "[a]s soon as the paperwork is completed." The fact that the estimated completion date varied from 30 to 60 days only serves to underscore the predicate: that as soon as the paperwork was done—whenever the date—the plaintiff had to go. Indeed, no dispute on this point arose until April 22, after the parties reached settlement, when the plaintiff reviewed the draft agreement and indicated to his counsel for the first time that he would prefer to retire on June 15. In short, the circumstances leading to the settlement demonstrate that any variance in the retirement date was purely a function of the time necessary to complete the logistical requirements of agency paperwork, counsel review, and court approval. *Patterson,* 795 A.2d at 683.

Accordingly, the court concludes that the defendant has met its burden by showing that the parties reached an enforceable agreement, and that under that agreement a reasonable person would have understood that the plaintiff was to retire immediately. *Mahoney,* 247 F.3d at 285; *Sagalyn,* 691 A.2d at 111; *Patterson,* 795 A.2d at 683.

## V.  CONCLUSION

For the foregoing reasons, the defendant's motion to enforce settlement granted by this court on April 30, 2003, is hereby supplemented by these Findings of Fact and Conclusions of Law as issued this 9th day of June, 2003.